# CASES DETERMINED

# January Term, 1918.

---

Davis, Appellant, vs. Estate of Smock, Respondent.

*January 9—February 5, 1918.*

*Married women: Separate property: Individual earnings: Claim against decedent: Admission of payment: Estoppel.*

[1. Whether, where a farm is owned in part by the wife and in part by the husband and is operated by both together, an agreement between them that all charges for board and care of a third person shall be considered her individual earnings and separate business is a valid agreement, not decided.]

2. During the last eleven years of his life a childless widower had made his home with his deceased wife's niece and her husband. There had been a considerable number of money transactions between them, and he had conveyed to the husband thirty-four acres of land with buildings for an expressed consideration of "one dollar and other good and valuable considerations." He also had done light work about the house and at times had purchased groceries for use in the home. While, as the niece knew, he was having his will drawn he called her into the room and asked her how much he owed her for board and care, to which she replied "Nothing; you have paid us over and over again." He then completed his will, making to her a bequest of $200. *Held*, that he was entitled to rely and to act, as he did, upon her admission, and that she was estopped to make any claim against his estate for his board and care.

Appeal from a judgment of the circuit court for Jackson county: James O'Neill, Circuit Judge. *Affirmed.*

Claim for $2,000 against the estate of John Smock made by *Laura M. Davis,* a married woman, for board and care

during the last eleven years of the life of the deceased. Smock died January 19, 1914, a childless widower of the age of sixty-nine years, at the farm home of the claimant and her husband, where he had made his own home for more than eleven years except for occasional absences when he visited other relatives. The claimant was a niece of Smock's deceased wife, and called him "Uncle." The relations between the parties were always of the kindest. There was no contract between them. Smock did more or less choring and odd jobs about the farm. He was not in good health and was confined to the bed at various times (how long does not appear) with lung and bowel difficulties. At times he lost control of his bowels and his care at such times was necessarily, an unpleasant task. The claimant and her husband lived on an eighty-acre farm. The title to the homestead forty was in the claimant's name, she having paid $200 of the purchase price out of her own money. The title to the other forty was in her husband's name, and both were worked as one farm. There were several children. The husband managed the farm, the claimant kept the house, and the business was carried on about as usual under similar circumstances, groceries and other supplies being purchased in the name of the husband and products sold in his name. The claimant testified, however, that it was understood between herself and her husband that the hens were her individual property and that whatever was due or received for board or care furnished to Smock was the claimant's individual and separate property. Smock had disposed of his own farm and home when he took up his residence with the claimant, and had at that time a piece of land of thirty-four acres adjoining the Davis farm, some ready money (how much does not appear), and a pension of $24 a month from the United States government. July 9, 1908, Smock loaned to claimant's husband $475, taking a mortgage on one forty of the Davis farm as security. Interest on this mortgage was paid up to July 9,

1912, and the principal and remaining interest was paid by claimant's husband to the executors of the Smock estate shortly before this claim was filed. December 9, 1913, Smock by warranty deed conveyed the thirty-four-acre piece before mentioned to the claimant's husband "in consideration of one dollar and other good and valuable considerations." There is no evidence tending to explain or contradict this recital of the consideration contained in the deed itself. At the time of Smock's death he had $2,500 on deposit in a bank, besides notes (including the Davis note of $475 above mentioned) amounting to about $800. The quarterly pension vouchers which Smock received were generally taken by him to the village of Irving, near by, and cashed, but the claimant and her husband cashed them several times at the request of the deceased. Smock had $77 in cash on his person at the time of his death.

The court found on ample evidence that on the 16th day of January, 1914 (three days before his death, being then fatally ill but entirely competent), he sent for a scrivener to draw his will, and after the scrivener's arrival asked that the claimant be called into the room. When she came in he asked her how much he owed her for board and care, and she replied, "You owe nothing; you have paid us over and over again," and left the room crying. Thereupon the deceased had his will drawn and left to the claimant a bequest of $200. The claimant admits that she was called into the room and that Smock asked the question what he owed her for board, and she replied, "Nothing, Uncle John, I only wish you could get well and live a while longer." She admits also that she knew he was making a will and explains that she made the statement just to pacify him in his weak condition, and didn't expect he would understand by it that he did not owe her anything.

On these facts the circuit court dismissed the claim on two grounds: first, because the claimant, a married woman, was

carrying on no separate business of her own, and that there was no evidence from which it was possible to separate the nursing and care furnished by the wife alone from the board and maintenance furnished by husband and wife jointly; and *second,* that the deceased relied on the claimant's statement that he owed her nothing and drew his will in reliance thereon; hence that she is estopped from now making any claim. The trial judge further added that the inference "is very strong that the deceased had from time to time been paying the plaintiff and her husband for board and care." The claimant appeals.

For the appellant there was a brief by *G. M. & H. M. Perry* of Black River Falls, and oral argument by *G. M. Perry.*

*Merlin Hull* and *E. J. Jedney* of Black River Falls, attorneys, and *W. H. Frawley* of Eau Claire, of counsel, for the respondent.

WINSLOW, C. J.   We should be slow to affirm this judgment on the first ground taken by the trial court, namely, the ground that the present claim for board and care was not, as matter of law, the individual earnings of the wife nor the fruits of her separate business under the married woman's statute (secs. 2343, 2345, Stats.).   Where, as here, a farm is owned in part by the wife and in part by the husband and operated by both together, the question whether an agreement between them that all charges for board and care of a third person shall be considered her individual earnings and separate business is a valid agreement, is a question which we do not wish to answer in the negative without more careful consideration than we are now able to give it.

We think, however, that the judgment must be affirmed on the second ground.   It is very evident from the testimony that there had been a considerable number of money transactions between Smock and the Davises.   A mortgage of $475

given by Mr. Davis to Smock was still unpaid; thirty-four acres of land with buildings worth more than $2,000 had been deeded by Smock to Mr. Davis in 1913 for the consideration, as expressed in the deed, of "one dollar and other good and valuable considerations;" during his stay at the claimant's home Smock did light work such as chores about the house, preparation of firewood, and repairing. The court also found that at times Smock purchased groceries for use in the claimant's home, the amount of which is not proven. The relations between the parties in money matters as well as socially had been very close, and it is quite clear that when, being about to make his will, he called the claimant into his room and asked her how much he owed her for board and care, he wished to find out how much, if anything, she claimed was the balance in her favor. When she replied, "Nothing, you have paid us over and over again," he was entitled to act upon that admission, and it is clear that he did so act. According to the witnesses present he lay a few minutes and then said, "Well, I would like to leave *Laura* a little, I would like to leave her about $200; she has been good to me and I would like to leave her that much more." He then had the will completed, making claimant a bequest of $200, and died in the belief that she had no claim on his estate and that he had made her a gift showing his appreciation of her kindness. Had she said, "You owe me $2,000," or "You owe me a sum which I shall have to figure up," it seems very certain he would not have given her, out of his little estate of $3,000, $200 additional.

There are here all the elements of equitable estoppel. Smock was about to draw his will and the claimant knew it. The question which he asked her was for the purpose of obtaining information on which to act in drawing the will and this she must have known. He accepted her statement as true, and on the basis of its truth made the bequest of $200 to her. The estate will suffer injury if the claimant is al-

lowed to change her attitude now, and this makes the estoppel complete.

The trial judge was of opinion that from all the facts, including the claimant's admission, the inference was very strong that the deceased had from time to time paid the claimant and her husband for his board and care. The judge does not seem to have actually found the fact of payment, but had he done so his conclusion would seem to have ample support in the evidence.

*By the Court.*—Judgment affirmed.